23-3009. Ms. Krebs. We'll take a break after the second or third, probably, case. Good afternoon, Your Honors, and may it please the Court. Lydia Krebs-Albert of the Federal Public Defender Office on behalf of Mr. Hohn. When Mr. Hohn placed his attorney-client call from CCA, both Mr. Hohn and his attorney believed that that call would remain confidential from the prosecution team. In other words, neither Mr. Hohn nor his attorney knew that the prosecution team could obtain or listen to that call. Was that a reasonable expectation? I believe it was, Your Honor. It was reasonable for a couple of reasons. First, CCA never warned him that this call would be available to the prosecution, although it did warn him that it was subject to monitoring or recording by CCA. But we see lots of cases where those sorts of conversations are introduced at trial and used. And you're saying the prisoners never know that the prosecution is ever going to hear their conversations? I'm not aware of any cases in which attorney-client calls have been admitted in that manner. But he didn't treat it as an attorney-client call. I mean, he had every opportunity to treat it as an attorney-client call. He treated it like, excuse me, Mr. Hohn, treated it like every other type of call. And so why would he have some special interest, some special protection against use of that when he, well, when he waived any rights to the attorney-client privilege, certainly? And so, Your Honor, I would point out that his attorney also harbored that same belief that although CCA could record and monitor these calls for certain purposes, his attorney believed that they couldn't be distributed to the prosecution. Had the number been entered, like the federal public defender number, as I understand it, was entered in the system, and therefore those calls were not recorded. And so either he or his attorney could have just entered that number and we wouldn't be here, right? And we also wouldn't be here, Your Honor, if the prosecutor had abided by her obligation to refrain from intentionally and unjustifiably becoming privy to that attorney-client call. Is that fair, though? Because how would she know that the defendant and the attorney had not entered the number? Now, obviously, she got the call and did not disclose, apparently. But why isn't the onus on the defendant and the attorney? In other words, I'm happy to be outraged by a lot of what happened here. But it seems like there should be some acknowledgment that this whole thing could have been avoided simply by counsel or the defendant entering those, however, 10 digits and the call wouldn't be recorded, couldn't be recorded. And actually, Your Honor, I think that is contrary to the district court's factual findings and to the party's stipulations. As it turns out, there were multiple occasions on which detainees and attorneys followed all of those rules, went through all of the steps that CCA told them that they needed to go through. And yet when CCA manually entered those phone numbers into the system, it often made errors. And so attorney-client calls were frequently recorded and distributed to the prosecution anyway. I would also point out that this court didn't put the onus on the defendant in Schillinger. The defendant in Schillinger could have stopped that whole thing from happening by not meeting in a public courthouse, in a public courtroom, by doing exactly what the trial court said that he could have done to keep the guard from staying in the room. The trial court said that if anybody had bothered to ask the trial court, the trial court would have said, well, lock the door and the sheriff's deputy can stand outside. But the defendant didn't take that reasonable step. In a riot, this court said that seeking judicial intervention to protect the privacy of your attorney-client communications, that onus is on the client, not some opposing party. This court said that the onus in Schillinger was not on the defendant to make sure that his attorney-client communications remained completely confidential, meaning confidential from any and all third parties. The onus was on the prosecution. And after this court decided Schillinger, Schillinger has been the law in this circuit for 30 years. The onus here was on the prosecutor, who, by the way— The law you're referring to was dictum, was it not? I'm sorry, the holding in Schillinger as far as the standards that apply in this case? Yes. The court said that we find prejudice, but we'll go on to talk about not meeting prejudice in certain circumstances. That discussion was not a holding of the court. And respectfully, Your Honor, I would disagree. I would say that at best these are alternative holdings, and alternative holdings are still holdings. Neither one would be dicta. If that's the case, Your Honor, then that first holding about, well, he proved prejudice, that would also be dicta. They are alternative holdings. And I would point out, Your Honor, that that is, in fact, what the federal district court ruled. The federal district court said, I'm granting you relief because you proved actual use, because you proved intrusion plus, and therefore proved prejudice. The Schillinger court could have said, we are affirming on exactly the same grounds as the district court did. But instead it said, district court, you did a great job. We agree that under the standard that you adopted, the defendant in this case satisfied your standard. We aren't going to adopt or apply that standard. We are going to craft our own standard. And we are going to do that by joining the circuits who have held that you don't have to prove actual use. All you have to do is prove these standards. And these standards did not include a privileged standard. And, in fact, the government now concedes as much. That's on page 37 of the government's brief. The Schillinger court resolved this case without any regard for privileged principles. The Schillinger court didn't expressly announce a privileged element in this case, even though its stated purpose here was to decide the standards, the Sixth Amendment standards that would govern this claim. That is not dicta. That is not a question that lurked in the record. The standards that this court adopted are this court's holding. Why do you think Schillinger presumed prejudice? What was the analysis that supported a presumption of prejudice? That's not very common. Go ahead. I'm sorry, Your Honor. I didn't mean to interrupt you. I think this court just explained in Orduno-Ramirez that the Schillinger presumption was based on two distinct rationales. The first is that this type of intentional and unjustifiable intrusion is so likely to cause prejudice in every case that the game isn't worth the candle. It's not worth the time to require courts to decide in each and every case whether prejudice occurred. This inherently and necessarily renders the trial unfair. So that was the first reason that the Schillinger court provided. The second reason is that when this happens, as this case proves, the type of prosecutor who is willing to engage in this type of intentional misconduct probably isn't going to be willing to come clean about what she did. And in fact, that is what happened here. The prosecutor tried to cover up her misdeeds. And not only that, but as the district court found in this case, evidence of prejudice, how and whether the government used this information, would be found solely in the government's own repositories. This is a finding of the district court here. Well, wait. The court listened to the call, right? Yes, Your Honor. The court did listen to the call. And we haven't heard a word about there being any prejudice. Because the court understood that this court's holding in Schillinger didn't require it to find prejudice. That that wasn't an element. But what the district court did find in this case is that after the district court ordered the government to search its repositories for that type of evidence, for proof of prejudice, the government willfully and wrongfully refused to search its repositories. The government cannot fault us for our failure to produce the very evidence that the government refused to search for and present to us. Tell me a little bit about the circumstances here, because that was not at all clear to me from the briefing. So what was the testimony? What was the evidence regarding what the prosecutor did and didn't do in terms of discovery? Is that before us? It is, Your Honor. I'm so sorry. I missed the last part of your question, Your Honor. No, go ahead. It is before the court. It is in the record. It's described at some length in the district court ruling. We're talking sort of about two different things here. There was what the prosecutor originally did, which was obtain and intentionally listen to this call without any legitimate law enforcement justification for doing so. At the time the prosecutor listened to the call the first time, what did the prosecutor know about whether the attorney was the other party to the conversation? So two points there, Your Honor. Along with the recording of the call, the prosecution also received sort of a data sheet that listed the phone number for the call. As the district court also found, there was no indication here that the prosecutor started listening to the call, realized that it was an attorney-client call, and stopped listening and went to the court and counsel. You say there's no evidence that the prosecutor did that. Right, and so, Your Honor. So talk about what the evidence is. The evidence is that in other cases, that is what occurred. In other cases, there were a handful of cases. This is a universe of 100-plus cases where the government was systematically collecting and harboring these attorney-client recordings. In a handful of those cases, I can think of maybe two or three, the government attorney, the prosecutor, realized that he had attorney-client calls. And he immediately reported that to defense counsel and to the court. And so the prosecutor, I'm sorry, the district court in this case, drew a reasonable comparison between those cases and said, this is the type of behavior that prosecutors engage in when they realize that they have this attorney-client call, and they don't want to listen to it, and they don't want to harbor it for the purpose of obtaining some sort of unfair tactical advantage. There are cases where that happened. But instead, this prosecutor did exactly the opposite. Rather than coming to the court and coming to defense counsel and saying that she had this call, she obscured intentionally the fact that she had this call, which could only mean— How? How? How? Right, so this— How did she do that? That's what I'd rather, instead of the conclusions, hear what the evidence was. My apologies, Your Honor. So the evidence in this case, there was an email chain where defense counsel for Mr. Hohn and defense counsel for his co-defendant were emailing with the prosecutor. The prosecutor said that she typically gives out calls, call recordings, if they are recordings that involve the defendant himself. So if Mr. Hohn had been placing non-attorney-client calls from CCA and the government had the recordings, the prosecutor said, you know, normally I give these out. And that's not—that's why I'm not giving them to your co-counsel's attorney, because co-counsel's attorney doesn't represent Mr. Hohn. Co-counsel responded and said, well, Mr. Hohn's attorney is on this email chain. Surely you're going to give those calls to Mr. Hohn. You just said that's what you usually do. And the prosecutor said, never mind. Actually, why don't you just get any calls from CCA, directly from CCA? So she refuses to do what she normally does. And this is in an email chain. Yes, and that is part of the record, Your Honor. Knowing that, if Mr. Hohn's attorney goes to CCA and says, give me all of your calls, there would be no way for defense counsel to know what calls the prosecutor has, because he will just be getting all of the calls that CCA has, including that attorney-client call. Your Honor, I see that I am out of time, and I would like to reflect the rest of my time. Before you sit down, if you could circle back to where we started. As I understood Judge Robinson's order, she's placing some of these cases in different buckets. And in this bucket, after an evidentiary hearing, she concluded that Mr. Hohn knew that the call was not going to be confidential because of the disclaimer. Am I correct in interpreting her order that way? I agree with Your Honor's characterization of the buckets, but I would add that she found that he did believe it would remain confidential from the prosecution team. She made a factual finding? He knew that it was not subject to the special process for an attorney-client phone call. Yes, so he knew, just like the defendant in Schillinger, that his communications could be monitored by a non-prosecutorial entity for security purposes. What if Hohn had disclosed to a cellmate his conversation with the lawyer, and then the cellmate told the prosecution? Isn't that a comparable situation? So, Your Honor, no Sixth Amendment violation would occur there. And no Sixth Amendment violation would occur there if the prosecutor inadvertently learned from that cellmate about that conversation. That is why Schillinger is very limited. Its per se rule is very narrow. It applies only to intentional cases of prosecutorial intrusions. So it's only if the prosecutor goes forward and seeks out and intentionally becomes— If the prosecutor sought out the cellmate, and that's her practice is to see what she can find from those conversations, wouldn't that be comparable? If the prosecutor went to the cellmate and said, I know that you know about attorney-client communications. Tell me about them. Then, yes, that would be just like the prosecutor who went to the sheriff's deputy and did the exact same thing. I know you were there for those communications. Tell me all about them. And the court said that a Sixth Amendment violation occurred there. I see that I am almost out of time, Your Honors. I would like to reserve the last few seconds for rebuttal. Thank you. Good afternoon, Your Honors. James Brown for the United States. Your Honors, this case is about a deliberate choice. Before Mr. Hohn made the call we're talking about today, he had two choices. First choice is he can make a private call to his attorney. He knew that he could follow CCA's protocols to make a privatized call to his attorney, and that call would not be recorded. The second choice is that he can make a non-private recorded call to his attorney. He knew that all calls from CCA are recorded and monitored for safety of the institution and for public safety, and that if he didn't privatize his call to his attorney, that call would be recorded. Mr. Hohn deliberately made the second choice. He chose to make a non-private recorded call, and accordingly, he gave up any interest in having a confidential call. Because Mr. Hohn made this second choice, the district court found that he waived attorney-client confidentiality as to that call because he had no reasonable expectation of confidentiality. And he waived attorney-client privilege. Why wouldn't anybody in that situation reasonably expect that the communication would not be given to an opponent? It seems reasonable. Even if you know it's not confidential in the traditional sense, would somebody expect it would be given to your enemy? Well, it goes against, first of all, it's a disclosure to an adverse third party. When he made the call to CCA, he was disclosing the contents to an adverse third party, that being CCA. Why would they be adverse? Well, they're adverse because they're the person who's keeping him locked up, and they're recording everything he says, and they're recording his movements 24 hours a day. Well, they're doing that for security reasons. I think that's the rationale behind the policy, and there's no security rationale that they would be listening into attorney-client conversations. Well, there is a security rationale. Mr. Hohn consented to have his calls recorded to protect the public. That's what his consent to monitoring form stated, to protect the public. Mr. Hohn testified at Record Volume 2, page 1050, that he knew that in some cases law enforcement would get the calls, and that those calls could be put into discovery. So he disclosed not only to CCA, but to the adverse third party, being law enforcement. And, of course, that's exactly what happened here. The sheriffs were investigating the homicide. They received information that Mr. Hohn was somehow involved in that, and to protect public safety, they subpoenaed his calls to investigate. So what if CoreCivic said, new policy starting today, no more exclusion for attorney's calls. We're just going to record everything. And prosecutors routinely seek the calls. They routinely get the attorney-client calls. Is there any issue there? There is. There's a huge issue there. In that case— What issue? Well, there's a huge issue. In that case, there wouldn't be a deliberate choice. Here, Mr. Hohn made a deliberate choice. He had a choice not to tell everything to CCA and to law enforcement, to whom he waived the privilege or waived. And also, in addition to not having a choice, he wouldn't be able to have a confidential conversation. Here, Mr. Hohn was able to have a confidential conversation. He made a choice not to have a confidential conversation. So the huge difference is the huge difference that it would be a Sixth Amendment violation at that point? If he didn't have a choice not to, for example, if he didn't have a choice not to have a confidential conversation and we got the conversation, that would be a Sixth Amendment violation. But keep in mind also, Your Honor, there's one thing that needs to be pointed out, and that is that these issues came about in 2016-2017. In May 2017, our office instituted a policy to guard against potential intrusions into potential attorney-client calls. And the court found that that policy has been largely curative. That's Record Volume 1, page 2847. Now we have a policy where we don't even come into contact with attorney-client calls except for a filter team to filter them out. And if we get them, we give them back to the defense. So the court found that policy is largely curative. I want to make sure I understand this. If it is an attorney-client call and there hasn't been a waiver by the prisoner, does someone listen to the call anyway but is isolated? There's some Chinese wall between the person who listens and the prosecution team, or does no one listen to the call? It's a filter team, Your Honor. We filter out any call between an attorney and client, and whether it's covered by the attorney-client privilege or Sixth Amendment or not, we do not give that call to the prosecution. We disgorge that call and give it to the defense. That's our policy. That's been in effect since May 2017. And the court found it to be largely curative. What was the policy when Mr. Holmes' calls were heard? We didn't have a policy at that point, Your Honor. His conviction— Well, what happened if he had listed his attorney as someone who was his attorney so the calls can't be used? If he had done what Mr. Holmes didn't do, what would have happened to his phone conversation with his attorney? It wouldn't have been recorded and we couldn't have gotten it. It would not have been recorded. No, and we couldn't have gotten it. But now it is recorded but filtered. Is that right? Now, if he did now what he did then, it would be recorded and it would be filtered and it would not be given to the prosecution. What if he did now what he didn't do before and said this is the phone number of an attorney? Would it be listened to or are those not recorded? I'm sorry, I'm not understanding the question. Well, for example, at the Supermax, a prisoner can talk confidentially, in quotes, with an attorney. There's an attorney who listens to the conversation to make sure it's legit, see if there's some national security problem or something like that. But that person who hears the conversation cannot have contact with the prosecutor. Is that what was done before? That's not what was done before. Before, we had a policy— So is that what's done now? It's been done since May 2017. So someone does listen to attorney-client. A filter team. Okay. And then we do not give those to the prosecutors. We discourage those calls to the defense attorneys. Why is there a Sixth Amendment waiver here when really we're just talking about an attorney-client privilege? I don't think Cohn was advised that he was knowingly and intelligently violating the Sixth Amendment just through the disclaimer privilege call system. Why should we extrapolate from that into a Sixth Amendment waiver situation? Well, for the same reasons the district court said we should. Under the Breguet case, the law presumes that a defendant who acts inconsistent with a known right has made a deliberate choice to relinquish that right. And actions can be discerned from words and conduct. And here, he knew it was right to have a confidential conversation. CCA's handbook told him he can make a privatized call to ensure attorney-client privilege. That put him on notice. It didn't say Sixth Amendment, a confidential call into the Sixth Amendment. But it didn't need to be that precise in order for that to be a waiver through words and actions based on behavior that's inconsistent with the right that you claim that you have. That's the Breguet case. And that is the Butler case. And that's what we say is waiver. But waiver is a whole separate issue from whether the Sixth Amendment attaches at all. You only get to waiver if you say the Sixth Amendment attaches. The district court said the Sixth Amendment doesn't attach because the conversation was not a confidential communication. Ms. Krebs pointed to some cases under the Confrontation Clause and the hearsay exception. What's your response to that distinction between a waiver of a privilege and a waiver of a constitutional right? Well, they're somewhat different. But the Breguet case says that basically it's functionally the same. You can waive through a course of conduct, through your words and your actions. Here he waived because he deliberately made a deliberate choice to make a recorded, non-private call, knowing at the same time that he had the ability to make a private, non-recorded call. That's the course of conduct indicating waiver. So had counsel known, had the AUSA known in advance that all of this was going to happen before the new system, the AUSA would have been entirely within her rights to say, just give me the calls, I want to listen to all the attorney ones, too. Your Honor, that's not a practice that we condone or defend. But my question is, just legally, I'm trying to find the line. You would say that that is on the legal side of the line. Our position is that intervening in a call that has recording, that says your call is being subject to recording and monitoring, and the defendant has a chance to have a confidential, non-recorded call, does not implicate attorney-client privilege, and does not render that call confidential under the Sixth Amendment. So we don't think that it violates the Sixth Amendment, and we don't think it violates the attorney-client privilege to listen to that call. But we have a policy, because we don't want to even get close to that line, of violating either of those things. That's why we put the policy in place. So nothing wrong here. There's no foul. I mean, you want a different system, you've got a different system. But if you still had the old system, your answer to me is there's no foul. Our answer to you is that we don't think it violates the Sixth Amendment. We don't think it violates the attorney-client privilege, and we think the case law reflects that. But we think it comes close enough that we don't want to have a violation at all. That's why we have the policy. And, Your Honor, our view comes from case law. I mean, if you look at the Hatcher case, if you look at the Mejia case, the Second Circuit and Eighth Circuit, they found that the attorney-client privilege is destroyed when an attorney and a client speak on a recorded jail line. They know it's being recorded with warnings that are very similar to what the defendant in this case received. You look at the Faulkner case from this circuit, Your Honor. This court found that a defendant consents to monitoring. That was a CCA case under the wiretap act, that it's a consent. You look at the Van Point case from the Ninth Circuit. When an attorney and a client talk on a recorded line in a jail, there's no reasonable expectation of privacy. That's why we say that. That's why that's our position is that it doesn't violate attorney-client privilege. It comes from case law. It seems to me there's an intermediate position, and that is that it's a violation, but prejudice isn't presumed. And I think you'd be on stronger ground, maybe not adequate ground, but stronger ground, if you focused on whether there should be a presumption of prejudice here and argued against that. Then we could determine what the attorney did with this information. We can listen to the call. I'm not sure if the judge did listen. Did the judge listen to the call? The judge says the judge listened to the call in the papers. And made no statement about prejudice, whether it could be prejudicial or not. The court found that the defendants do not – that they disclaim prejudice. They don't claim actual prejudice. They don't claim a realistic possibility to prejudice. But to your point, Your Honor, if I may, we have alleged there's no prejudice all along. All along we have alleged – But that's a different argument from the one you were just making. Well, I was not – There's a difference. Okay. Go ahead. You're arguing in part that there's no violation of the Sixth Amendment. But perhaps whether there was a violation of the Sixth Amendment turns on whether the defendant was prejudiced by the attorney listening to it. Because there's a difference here, it seems to me, between getting access to a call that's just in the whole stack of calls you receive. He didn't do anything to protect his attorney-client relationship because he didn't identify this as an attorney-client call. A difference between that and Schillinger where, yeah, there was a law enforcement person, a sheriff, present. I'm not sure how far away from the discussion. And the prosecutor seeks out the sheriff to find out what he can learn or she can learn – I don't remember the gender of the prosecutor in that case – what the strategy, what the tactics of the defense were going to be. And the presumption of prejudice arises in various contexts when you know someone is trying to get prejudicial information and discovery in the Brady issues. If the prosecution intentionally destroyed evidence that might have been useful, the court is going to presume it would be useful to the defendant. And it seems to me that that analysis, that type of analysis, would justify a presumption of prejudice in that case. And the question is, was this – at least one of the questions in this case – was the conduct of the prosecution in this case like that in Schillinger or the Brady situation where we should presume prejudice because the whole purpose of what the prosecutor was doing was to look for strategy by the defendant? That was a long question. You can have some time to answer and she'll get some answers. Your Honor, to Your Honor's first point, the reason I didn't bring up prejudice is because I was responding to Judge Phillips' question. Okay, that's all right. And we've argued at length that Schillinger's presumption of prejudice should have no play in this case. And why do you think it should? We've argued that it's against vertical stare decisis. We've argued that it's dicta. We've argued that it's a supervisory and prophylactic rule. Have you argued that it's wrong on the merits? What's that? You give reasons for distinguishing it, but it's a matter of policy. Why would – Right. We have, Your Honor. And what's been your argument? We've argued that it allows – it's the same arguments that the court faced in Weatherford and found, that a presumed prejudice rule allows a district court to set aside a conviction when there has been no Sixth Amendment violation. That's what the presumed prejudice rule allows. That's why it violates vertical stare decisis. That's why it is a prophylactic supervisory rule that gets around Weatherford and gets around Morrison. And Schillinger has prevented us from arguing the very point that Your Honor said we should have argued all along, that there was no prejudice. It presumes prejudice, even if there's no prejudice at all. That's why we were hamstrung by Schillinger the whole time. Well, are we not also hamstrung? We don't think this court is hamstrung. What's the way out? The way out is that if you look at Schillinger's presumption of prejudice, it is not a holding. It is dicta. Are you speaking to Ms. Krebs' alternate holdings point? No, we're not. The court asked how we get out of this. Here's how. You say, number one, the presumed prejudice rule is dicta because it was not essential to the determination of Schillinger. In Schillinger, this court found the defendant was actually prejudiced. Well, her point was that that's an alternative. That could be considered the alternative holding. Well, that's the only thing they rely on to get what they want is the presumed prejudice rule. We've argued at length that there's no prejudice. They've disclaimed all prejudice, actual or any realistic possibility or a factual possibility. You take away that, they don't have a case and they don't have a Sixth Amendment violation. That's what we've been arguing all along. And, Your Honor, to your point, Judge Stoltz, the second way to get around it is you can say that that presumed prejudice rule violates vertical stare deceases. It violates Weatherford. It violates Morrison, but it especially violates Weatherford. Look at our argument on a brief. I don't know how that really helps because Schillinger dealt with both those cases. Well, Schillinger's rule cannot survive the rationale of Weatherford. Weatherford said a presumed prejudice rule cannot stand because it allows for the vacator of convictions even when there's no Sixth Amendment violation. That same rationale applies exactly here. There was no Sixth Amendment violation as the district court found. So you can't have a presumed prejudice rule. It's the same rationale. The third way to get around it is you say it's a prophylactic supervisory rule that this court enacted that circumvents Weatherford. And on that basis, it violates Sarnaev and it violates this court's supervisory authority. We've argued all three of those things, but those are the three ways you can get around the presumed prejudice rule. And then there's a fourth way, which would be an en banc review of Schillinger. That's a possibility. I've just given the court the three easiest ways, though. Thank you. I see my time is up and I thank the panel for the extra time. Thank you. And give Ms. Krebs three minutes, please. Three minutes total of adding his term. But I thought she was left with that's close to. Thank you, Your Honor. I would like to make two points. The first is that the government has conceded throughout its brief that Schillinger's per se rule is a holding and not dicta. It uses the term holding repeatedly. It also describes it as Schillinger's decisional rationale. But it comes in a context. And the context is that the government there used the information. It cross-examined the defendant with the information it learned from the deputy sheriff. And that didn't happen here. You're right. Is that meaningless? It is a distinction without a difference because that is the ground that the federal district court relied on to affirm and to I'm sorry, to grant relief, to grant habeas relief. But then when this court came along, this court said, yes, you satisfied the federal district court's intrusion plus standard by proving actual use. But we aren't going to adopt that test. We are going to create our own test. The court then proceeded to resolve the constitutional claim without regard for actual use. It only discussed actual use when discussing the appropriate remedy. So the alternate holding thing is up to us today. It's not like the opinion itself says there are these two alternate holdings and they're inviolate for the next however many decades. That's something we can interpret. Why could we not interpret Schillinger to say there's prejudice if? Prejudice per se if. That overall context, which is what the cases look at for structural error. If the overall context shows that there probably it's a waste of time to even ask if there's prejudice because there is. In that case, it was the cross-examination. Nothing like that here. You lose under Schillinger. So two points, Your Honor. In Orduno Ramirez, this court recently referred to Schillinger's per se prejudice rule as a holding and it didn't discuss actual use. It said that in Schillinger, this court said that when an intentional and unjustifiable prosecutorial intrusion occurs, intrusion being the prosecution became privy to this information, that is when the violation occurs. And that makes perfect sense, Your Honor, because the type of prosecutor, if you have no legitimate law enforcement justification for becoming privy to these communications and you intentionally do it anyway. If you aren't doing it for some legitimate purpose, why are you doing it? That's why it makes perfect sense to assume, to presume under those circumstances that prejudice occurred, that you used it in some way that you don't think there's a difference. Factually, the reason I asked you about the rationale behind the presumption of prejudice is it seems to me there's a difference. Maybe it's not material. You obviously don't think so. But there's a difference between what the prosecutor did in Schillinger and having the call dumped in your lap, which is what happened in this case. The subpoena wasn't for attorney-client communications. It was for all the communications of this person, of Mr. Hohn. And this was one of the calls in that batch. Am I wrong about that? No. It was one of the calls in the batch. The subpoena also didn't exclude attorney-client calls. And the district court found that the prosecutor in this case intentionally became privy to the call, knowing that it was an attorney-client call. That was one of the elements that we had to— At what point did she—what's the evidence about when she knew it was an attorney-client conversation? I don't know that the district court expressly found when she knew that it was an attorney-client communication. But the district court found that she did know, and that she intentionally listened to it anyway. Well, when she first listened, was she told it was an attorney-client conversation before she listened to anything? I don't know about that, Your Honor. Would that make a difference? Well, I think— If you intentionally listen to it and don't know that it's an attorney-client conversation, that might put a different color on it, wouldn't it? I understand, Your Honor. But the district court found that she intentionally became privy to attorney-client communications. Not she intentionally listened to a call that she had no idea contained attorney-client communications. She intentionally became privy to attorney-client communications. And again, if she had realized early on when she heard at the beginning of the call someone identify themselves as an attorney, and had stopped listening, then she presumably would have told someone that because that was an element, the intentional privy to. The government could have defeated this entire claim had the prosecutor come clean in the beginning and said, yeah, I listened to a little bit of that attorney-client call, but I didn't know it was an attorney-client call when I started listening, and I stopped listening as soon as I realized it. That is not the factual scenario that we have here today. But it's consistent with the judge's description or nondescription of the call that the prosecutor listened to this. That's a nothing. It's got nothing to help me, nothing of relevance. No need to tell anyone about that because no way the prosecutor can use that call anyway. I'm sorry, Your Honor. I don't think I'm understanding the court's question. Well, you attribute sinister motives to the prosecutor who listened, not disclosing this. But one possibility, which is fully consistent with the district court's non-report of the contents, was that the prosecutor who listened to the call felt it was a nothing call. So maybe it was a scheduling call. We don't know. We don't know. And therefore, there's no need to – no one would be interested. So we do know that it's not a scheduling call, Your Honor. The district court found that this call related – it's a substantive attorney-client call. They're related to matters concerning legal advice or strategy, including whether he wanted to – So the court did say that? Yes. The district court made a finding about the substance of the call. They discussed things like whether he wanted to go to trial, the government's evidence against him, the problems with that evidence. This was a substantive call. It was not a scheduling call. It was – oh, I'm sorry. Let me just – you'll get the answer. But I thought you said – okay. But the court nevertheless said or didn't say whether it was prejudicial to him or not. The disclosure – The court didn't make any findings about prejudice because the court agreed with us that it didn't have to. So if that's the court's question, then that would be something that would have to be remanded to the district court to decide. It was a six-minute call and the introduction of this counsel to the client, right? Yes, that's correct, Your Honor. Have you heard the call? I have, Your Honor. Has everyone except us heard the call? No, Your Honor. Why don't we get to hear the call? We didn't add it to the record because the only reasons that the government was citing it were, one, its argument that it wouldn't be prejudicial, but our position is that we don't have to prove prejudice, and two, to prove that Mr. Hone knew that the call was being recorded, but Mr. Hone admitted that he knew the call was being recorded and the district court made that finding. If it were dripping with prejudice, we would assume you would tell us that. I disagree, Your Honor, because we believe that Schillinger's per se rule makes any argument about prejudice irrelevant, that this is the type of scenario that, as this court recognized in Schillinger, necessarily renders the trial unfair without regard for the actual substance of the communication. This is a call months and months before, and there was a lengthy trial with all kinds of cooperating witnesses testifying and a guilty verdict. And, Your Honor, this court has said that the value of the right to counsel, the Supreme Court has said this, is perhaps at its apex before trial, not at trial, precisely during these calls when you are deciding how the case will proceed. So I think the timing of the communication is not an element of a Schillinger violation. Thank you very much for your time, Your Honors. We would ask the court to reverse. Thank you, counsel. Well argued. The case is submitted. Counsel excused.